UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD STEELE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 6630 |
| v. | ) |
| | ) Judge Thomas M. Durkin |
| WEXFORD HEALTH SOURCES, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION & ORDER**

Plaintiff Ronald Steele has sued defendants Ghaliah Obaisi (as independent executor of the estate of Dr. Saleh Obaisi ("Obaisi")), Randy Pfister, and Don Mills in their individual capacities, along with Wexford Health Sources, Inc. ("Wexford"), in a single count complaint for deliberate indifference to Steele's medical needs. Currently before the Court are two motions to dismiss: (1) defendants Mills and Pfister's motion (R. 28); and (2) defendant Wexford's motion (R. 31). For the reasons explained below, the Court denies both motions.

**STANDARD**

The complaint must provide "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. Civ. P. 8(a)(2). Through this statement, defendants must be provided with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This means the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*,

550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann*, 707 F.3d at 877 (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## BACKGROUND

Since at least early 2014, Steele has experienced a spinal condition resulting in severe and chronic pain in his neck, numbness in his shoulders, arms, and hands, and a limited range of cervical motion. R. 21 ¶ 15. As a result, Steele has been unable to sleep through the night or engage in fitness activities. *Id.* ¶ 16.

At some point in 2014, while housed at Stateville Correctional Center in the custody of the Illinois Department of Corrections ("IDOC"), Steele began seeking treatment for his spinal condition from the Stateville medical unit. *Id.* ¶ 17. Initially, policies set by Wexford and IDOC resulted in Steele being treated by registered nurses instead of a licensed physician. *Id.* ¶¶ 18-19. The registered nurses prescribed Steele only over-the-counter pain medication, which did not improve his condition, and they did not refer Steele to a licensed physician. *Id.* ¶¶ 20-21. Steele tried to seek follow-up treatment from a licensed physician, but was denied treatment numerous times due to inadequate staffing. *Id.* ¶ 22.

In April 2015, Steele received authorization to see a licensed physician, and now-deceased defendant Obaisi—then-medical director at Stateville and an

2

employee of Wexford—began to treat Steele. *Id.* ¶¶ 23, 44-45. From April 2015 through 2016, Obaisi prescribed Steele over-the-counter pain medication, including aspirin and naproxen, which did not alleviate Steele's pain. *Id.* ¶¶ 24-25.

In late April or early May 2016, Obaisi and Wexford authorized an x-ray, which Steele received on May 2, 2016. *Id.* ¶¶ 26-27. Based on the x-ray results, Stateville medical staff recommended that Steele obtain an MRI from an outside specialist. *Id.* ¶ 28. But Obaisi and Wexford did not authorize Steele to see an outside specialist until early 2017. *Id.* ¶ 29.

In February 2017, Steele began to see outside specialists at the University of Illinois-Chicago Medical Center ("UIC"). *Id.* ¶ 30. An MRI of Steele's cervical spine conducted at UIC on March 27, 2017 revealed that Steele suffered from "degenerative and severe spinal canal stenosis at the C3-C6 vertebrae, with mylemalacia at C3-C4 and C4-C5 with multilevel moderate-to-severe neuroforaminal narrowing." *Id.* ¶¶ 31-32. The MRI also revealed cord signal changes. *Id.* ¶ 32.

As a result of the MRI, Steele's physicians at UIC recommended that he undergo an Anterior Cervical Discectomy and Fusion surgical procedure at the C3-C6 vertebrae. *Id.* ¶ 34. Steele's physicians at UIC transmitted an order to Obaisi and Wexford instructing that Steele should not take aspirin or naproxen for at least one week prior to his scheduled surgery on May 30, 2017 because of risks of severe bleeding. *Id.* ¶¶ 35-36. But Obaisi and Wexford did not communicate this to Steele. *Id.* ¶ 37. Because Steele continued to take aspirin and naproxen up to the scheduled

surgery date, his surgery was cancelled. *Id.* ¶ 38. Obaisi, Mills, and Wexford did not provide the necessary approvals to reschedule Steele's surgery until several months later. *Id.* ¶ 39.

On April 3, 2017, Steele approached Pfister, the warden at Stateville, and complained about his medical condition and Obaisi's failure to appropriately treat it. *Id.* ¶ 63. Steele reiterated those complaints to Pfister on June 3, 2017. *Id.* ¶ 64. Pfister responded that he would discuss the issues with Obaisi and help Steele get appropriate treatment, but Steele believes those discussions never took place. *Id.* ¶¶ 65-66. Steele followed up with a letter to Pfister on July 1, 2017, to which Pfister never responded. *Id.* ¶ 67.

On April 17, 2017, Steele informed Mills, the healthcare administrator at Stateville, of Obaisi's failure to provide him with appropriate medical treatment, and reiterated his complaints on June 1, 2017, July 11, 2017, and September 20, 2017. *Id.* ¶¶ 58, 60. In Steele's July 11, 2017 letter to Mills, Steele documented his efforts to obtain medical treatment and Obaisi's failure to provide it. *Id.* ¶ 60. Mills allegedly dismissed or ignored all of Steele's complaints and instructed Steele to discuss his complaints with Obaisi. *Id.* ¶ 59. Steele informed Mills that Obaisi had instructed him to discuss the complaints with Mills. *Id.* Mills then said he would talk to Obaisi, but Steele believes those discussions never occurred. *Id.*

Steele filed written grievances with Stateville on June 28, 2016, January 5, 2017, March 2, 2017, and April 14, 2017 about his pain, inappropriate treatment, and delayed treatment. *Id.* ¶ 42. All of these grievances were denied. *Id.*

Steele filed this lawsuit on September 14, 2017. R. 1. At the time the original complaint was filed, Steele still had not undergone surgery. *See* R. 21 ¶ 40. This Court conducted a Section 1915 merit review and appointed counsel for Steele on October 10, 2017. R. 5.

Steele finally underwent surgery on November 3, 2017. R. 21 ¶ 40. During this time, Steele was not timely prescribed a lower bunk permit, double mattress, or cervical pillow as requested to alleviate his pain. *Id.* ¶ 41.

Steele's counsel filed an amended complaint on Steele's behalf on January 25, 2018. R. 21. That single-count amended complaint alleges deliberate indifference to Steele's serious medical needs by all defendants in violation of the Eighth Amendment, and seeks injunctive relief (ordering defendants to provide a cervical pillow and a bottom bunk permit) as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983. *Id.* ¶¶ 93-104.

With respect to Wexford in particular, the amended complaint alleges that Steele's denial of "access to adequate medical care was caused, at least in part, by Wexford's policy or practice of delaying or refusing necessary medical care as a means of reducing costs." *Id.* ¶ 100. Steele alleges that Wexford "has an economic incentive to provide minimal medical care to inmates" because of its flat payment contract with Illinois. *Id.* ¶¶ 68-69. Steele points specifically to Wexford's alleged policy or practice of requiring first the Stateville medical director and then a Pittsburgh-based physician to approve or reject a recommendation before an inmate can be referred for offsite medical services, which can result in significant delays.

5

*Id.* ¶¶ 82-84. Steele further points to Wexford's practice of preferring UIC to other, more local offsite providers, which also can result in significant delays. *Id.* ¶¶ 85-86. Steele alleges that as a direct result of Wexford's policies or practices, Steele endured many months of unnecessary and unreasonable pain and suffering. *Id.* ¶¶ 90-92.

In further support of his policy and practice allegations against Wexford, Steele cites two reports. Both reports are attached to Steele's amended complaint and therefore properly considered on a motion to dismiss. *E.g.*, *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) ("When ruling on a motion to dismiss, the court may consider documents . . . attached to the complaint."). First, Steele cites Dr. Ronald Shansky's expert report in *Lippert v. Ghosh*, No. 10-cv-4603, Dkt. 339 (May 19, 2015), which criticizes Wexford and concludes that there is a "major problem with access to care" at Stateville. *Id.* ¶¶ 72-76 & Ex. A. The report finds in particular that inadequate staffing results in substantial delays in treatment. *Id.* ¶¶ 76-77.

Second, Steele cites a 2013 report regarding the John Howard Association of Illinois' monitoring visits to Stateville ("JHA Report"). *Id.* ¶ 78 & Ex. B. The JHA report concludes that medical staff at Stateville "are discouraged by Wexford administrators from ordering certain medications and supplies due to cost." *Id.* ¶ 79. The JHA report also finds that the approval rate for offsite medical services "varies dramatically based on which Pittsburgh-based physician [designated to approve referrals] happens to be receiving the phone call." *Id.* ¶ 83. And even when

offsite medical services are authorized by the Pittsburgh-based physicians, Wexford's staff routinely takes up to eight weeks to transmit authorization to Wexford's preferred offsite provider. *Id.* ¶ 84. Finally, Steele cites five examples of recent lawsuits against Wexford alleging that Wexford's cost-saving policies and practices prevented the plaintiffs from receiving timely medical treatment. *Id.* ¶ 87 (collecting cases).

Mills and Pfister together, and Wexford separately, have moved to dismiss Steele's amended complaint. R. 28; R. 31. Ghaliah Obaisi, who the Court substituted for Dr. Saleh Obaisi upon suggestion of Dr. Saleh Obaisi's death (R. 51), has answered the amended complaint (R. 52).

## ANALYSIS

### I. Mills and Pfister's Motion

Mills and Pfister first argue that Steele has not stated a claim for deliberate indifference. They further dispute Steele's entitlement to certain remedies he seeks.

#### A. Adequacy of Pleading Deliberate Indifference

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To state a claim for deliberate indifference based on failure to provide adequate medical treatment, a plaintiff must allege facts sufficient to show that he suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Whiting v. Wexford Health Sources,*

*Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Prison officials may show deliberate indifference to a serious medical condition through inaction, *Gayton v. McCoy*, 593 F.3d 610, 623-25 (7th Cir. 2010), or by delaying necessary treatment and thus aggravating an injury or needlessly prolonging an inmate's pain, *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

Mills and Pfister maintain that Steele has not pleaded sufficient facts to establish either prong of his deliberate indifference claim. But with respect to the first prong, this Court already has determined in its initial screening of Steele's original complaint that Steele "sufficiently identified at least one serious medical condition that require[d] surgical intervention that [was] inexplicably delayed for months," satisfying the first prong of deliberate indifference. R. 5 at 3-4. Steele's amended complaint reinforces this Court's initial conclusion by providing further detail about his spinal condition and diagnosis.

Mills and Pfister argue that Steele must plausibly allege that his condition worsened because of the delay and therefore constituted an objectively serious medical condition satisfying the first prong, citing *Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009), *Jackson v. Pollion*, 733 F.3d 786 (7th Cir. 2013), and *Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015). But these are all summary judgment cases. They stand for the proposition that at the summary judgment stage, a plaintiff must "introduce[ ] verifying medical evidence that shows his condition worsened because of the delay"—*i.e.*, that "the delay . . . caused some degree of harm." *Knight*, 590 F.3d at 466 (granting summary judgment where "at most two and a half hours

passed between the injury . . . and the treatment"); *see also Jackson*, 733 F.3d at 788-90 (no injury where three-week interruption in receiving blood pressure medication resulted in only slightly elevated blood pressure); *Conley*, 796 F.3d at 749 (to survive summary judgment, "the plaintiff must offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm"). As the Seventh Circuit made clear in *Conley*, whether a delay in treatment caused harm is a fact issue not properly resolved on a motion to dismiss. *See* 796 F.3d at 749 (reversing grant of summary judgment on deliberate indifference claim predicated on delay in treatment and explaining that "causation is normally a matter for the jury"); *see also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (even at the summary judgment stage, the "verifying medical evidence" required "to establish the detrimental effect of delay" and therefore "the seriousness of [plaintiff's] medical condition" need not be expert testimony; finding a genuine issue of material fact based on medical records "indicating that [plaintiff] had a nasal fracture . . . and that he may need to see a specialist").

At the motion to dismiss stage, the Seventh Circuit has found allegations like Steele's of prolonged and unnecessary pain due to a delay in treatment sufficient to plead a detrimental effect. *See, e.g.*, *Gomez*, 680 F.3d at 865-66 (plausible deliberate indifference claim based on four day delay in treating wound that resulted in "prolonged, unnecessary pain"). Moreover, and in any event, Steele does allege that his condition was "degenerative," R. 21 ¶ 32, which plausibly supports an inference that his condition worsened as a result of defendants' actions.

9

Mills and Pfister further argue that Steele has failed to plausibly allege that Mills and Pfister knew of and disregarded an excessive risk to Steele's health for purposes of the second, subjective prong of his deliberate indifference claim. As this Court explained in its initial screening order, a prison official who is made aware of specific conditions posing a serious risk to inmate safety through grievances or other inmate communications may be subject to personal liability for deliberate indifference if he or she fails to act reasonably to address that risk. *E.g.*, *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) ("[plaintiff's] grievances," to which warden signed response, "demonstrate[d] the prison and warden's knowledge of the conditions about which [plaintiff] [wa]s complaining"); *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) ("[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority to take the needed action to investigate, and, if necessary, to rectify the offending condition. . . . In other words, prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference.").

This Court already found in its initial screening that Steele "has sufficiently alleged that he notified Don Mills and Randy Pfister of his unresolved serious symptoms, both in writing and in person, but they did not act reasonably to ensure that he received appropriate treatment." R. 5 at 4. Mills and Pfister nevertheless argue that Steele's even more detailed allegations in his amended complaint are insufficient. Mills and Pfister emphasize that they were at most aware of a five-

month delay (between June 2017, when Mills and Pfister learned that Steele's initial surgery had to be rescheduled, and the November 2017 surgery). Mills and Pfister argue that within that window, Steele has made only "unsupported, conclusory statements" that Mills and Pfister "did not assist with his medical care," which at most "amounts to mere negligence." R. 28 at 4-5.

This argument mischaracterizes the amended complaint. In fact, the amended complaint alleges the specific dates and contents of Steele's multiple complaints to Mills and Pfister about his medical condition and inadequate treatment, along with their alleged inadequate responses. With respect to Mills, the amended complaint alleges that Steele sought Mills's assistance directly on several occasions between April 2017 and September 2017, including writing him a letter on July 11, 2017 requesting assistance to reschedule Steele's surgery as soon as possible, and that Mills ignored those requests. R. 21 ¶¶ 58-60. The amended complaint further alleges that for months, Mills (along with Obaisi and Wexford) failed to provide the necessary approvals to reschedule Steele's surgery, and that as a result, Steele endured more than five months of unnecessary pain and suffering. *Id*. ¶ 39. Similarly with respect to Pfister, the amended complaint alleges that Steele complained in person to Pfister about his pain on multiple occasions between April and June 2017, that Pfister told Steele he would address his concerns and did

not, and that Pfister ignored a letter Steele wrote on July 1, 2017 asking for help ordering the medical staff to reschedule his surgery. *Id.* ¶¶ 63-67.[1]

These are far more than the unsupported, conclusory statements that Mills and Pfister make them out to be. The amended complaint's allegations support a claim for deliberate indifference by Mills and Pfister in their individual capacities. *See, e.g.*, *Perez*, 792 F.3d at 776 (plaintiff stated deliberate indifference claim against non-medical prison official where "complaint allege[d] that the named defendants each obtained actual knowledge of [plaintiff's] objectively serious medical condition and inadequate medical care through [plaintiff's] coherent and highly detailed grievances and other correspondences," and "that each of these officials failed to exercise his or her authority to intervene"); *Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001) ("[Plaintiff] alleges that he repeatedly complained to each of the named defendants, filed a grievance, and requested medical attention frequently. . . . [Plaintiff] claims the defendants did nothing. This inaction satisfies the subjective element of an Eighth Amendment claim.").[2]

---

[1] These allegations are corroborated by Steele's four grievances and his July 2017 letters to Mills and Pfister, which are attached to Steele's original complaint (R. 1 at 17-28) and therefore properly considered on this motion to dismiss. *See, e.g.*, *Sorrentino v. Wexford Health Sources, Inc.*, 2017 WL 4682735, at *2 n.1 (N.D. Ill. Oct. 18, 2017).

[2] Pfister also argues that he, "in his official capacity as warden, was entitled to delegate to the prison's medical staff the provision of good medical care, especially in light of the fact that there is no dispute that [Steele] was under the continuing care of medical professionals." R. 28 at 5. But Steele has not sued Pfister in his official capacity. *See* R. 21 ¶ 6 ("Defendant Pfister is sued in his individual capacity."). And in any event, as this Court recently explained in the course of finding that a plaintiff stated a deliberate indifference claim against warden Pfister, "if the plaintiff can 'demonstrate that [a] communication, in its content and manner

12

B. **Remedies Sought**

Mills and Pfister also make several arguments to try to cabin the relief Steele may obtain from them. These requests for relief are not separate claims, but parts of claims. And the Court does not have power to dismiss parts of claims on a Rule 12(b)(6) motion to dismiss. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."). The Court nevertheless addresses Mills and Pfister's arguments in order to clarify the available remedies going forward.

Mills and Pfister first say that because Steele does not allege that the delay in treatment exacerbated any physical injury, Steele cannot obtain compensatory damages for his pain and suffering. They note that "absent a showing of physical injury, [42 U.S.C. §] 1997e(e)" of the Prison Litigation Reform Act ("PLRA") "bar[s] a prisoner's recovery of compensatory damages for mental and emotional injury." *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003).

---

of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety,' then the plaintiff has plausibly alleged a deliberate indifference claim." *Sorrentino*, 2017 WL 4682735, at *2 (quoting *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)).

Here, Steele's letter to Pfister attached to his original complaint (R. 1 at 19) makes detailed requests regarding rescheduling his surgery and refers to previous communications with Pfister. R. 1 at 19. As in *Sorrentino*, this letter, coupled with the amended complaint allegations, is sufficient to state a deliberate indifference claim against warden Pfister. *See* 2017 WL 4682735, at *2-3 (grievance records supported plaintiff's deliberate indifference claim against warden Pfister).

13

This principle is well-established, but Steele rightly points out that it does not apply to the facts as alleged. The amended complaint plausibly describes a physical injury resulting from defendants' deliberate indifference, including prolongation of a degenerative spinal condition that ultimately required surgery. R. 21 ¶¶ 15-16, 21, 25, 38-39, 42, 58-60, 63-67. This is not a case alleging "solely . . . mental or emotional injury." *Compare Perkins v. Pfister*, 711 F. App'x 335, 337 (7th Cir. 2017) ("Perkins could not be entitled to compensatory damages. He has not alleged any *physical* injury, and he cannot recover solely for mental or emotional injury under the [PLRA].") . At least at this stage, therefore, the Court does not find that the allegations preclude Steele from seeking compensatory damages.

Next, Mills and Pfister correctly explain that Steele may not recover injunctive relief from them. Injunctive relief may be obtained against public officials in their official capacities only. *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("[I]njunctive relief against a state official may be recovered only in an official capacity suit."). Steele has sued Mills and Pfister in their individual capacities.

In response, Steele concedes this principle, and further acknowledges that his requested injunctive relief of a bottom bunk permit and a cervical pillow is partially moot because defendants have provided Steele with a bottom bunk permit. R. 42 at 13. But because defendants have not yet provided Steele with a cervical pillow, Steele requests that the Court grant him leave to name Mills and Pfister in their official capacities. The Court grants Steele's request to amend with respect to Mills. The Court does not grant Steele's request with respect to Pfister, however, because

he is no longer warden of Stateville and in a position to enforce equitable relief. *See* R. 48 at 3.

## II. Wexford

Steele's claim against Wexford "is evaluated under the standard of *Monell*." *See, e.g.*, *Taylor v. Wexford Health Servs., Inc.*, 2012 WL 245165, at *4 (N.D. Ill. Jan. 26, 2012). "To hold [Wexford] liable under § 1983 and *Monell*, [Steele] must demonstrate that [Wexford's] official policy, widespread custom, or action by an official with policy-making authority was the moving force behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). "To prove an official policy, custom, or practice within the meaning of *Monell*, [Steele] must show more than the deficiencies specific to his own experience"; he must show "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Id.* at 734-35.

This Court previously dismissed Wexford from this case without prejudice because Steele's original complaint failed to allege that Wexford's alleged policy of "limits on referrals to outside providers to cut costs . . . had anything to do with the care [Steele] challenges." R. 5 at 4-5. The Court noted that Steele in his initial complaint "seem[ed] to allege that the longest delay in his care was internal—as he awaited an appointment with Dr. Obaisi." *Id.* at 5. In his amended complaint, however, Steele makes 24 paragraphs worth of detailed factual allegations concerning Wexford's alleged cost-cutting policy or practice and its impact on

15

Steele's challenges specifically and other inmates' experiences at Stateville. R. 21 ¶¶ 68-92.

In support of its motion to dismiss, Wexford cites several recent cases in this district dismissing *Monell* claims against Wexford, including *Taylor v. Wexford Health Sources, Inc.*, 2016 WL 3227310, at *4 (N.D. Ill. June 13, 2016), *Peacock v. Rigsby*, 2016 WL 1383232, at *3 (N.D. Ill. Apr. 7, 2016), and *Young v. Obaisi*, 2015 WL 8013437, at *3 (N.D. Ill. Dec. 7, 2015). In each of those cases, however, the plaintiffs' allegations were vague and broad; they did not tie the plaintiff's injury to any specific Wexford policy or practice. *See Taylor*, 2016 WL 3227310, at *4 (dismissing *Monell* claim against Wexford where "allegations of Wexford's policies and practices [we]re vague and broad," without "additional facts to allow the Court to infer that these policies impacted the care Taylor received"); *Peacock*, 2016 WL 1383232, at *3 (dismissing *Monell* claim against Wexford where the plaintiff's "factual allegations d[id] not plausibly allege how a cost-cutting policy could possibly have caused his infection," and in particular "fail[ed] to allege that the cost of bandages and antibiotics is a significant percentage of Wexford's budget such that a cost-cutting policy would have entailed restricting provision of bandages and antibiotics"); *Young*, 2015 WL 8013437, at *3 (dismissing *Monell* claim against Wexford where plaintiff did not allege *any* "policy or practice of Wexford's that led to or exacerbated [plaintiff's] injuries").

By contrast, as this Court explained in *Peacock*, numerous courts in this district have denied motions to dismiss *Monell* claims against Wexford where "the

16

plaintiff alleged deprivation of more expensive treatment (such as denying or delaying referrals to specialists outside the prison)" based on Wexford's alleged cost-cutting policy, "or included additional facts that made the plaintiffs' claims plausible." *See Peacock*, 2016 WL 1383232, at *3 (citing *Harper v. Wexford Health Sources*, 2016 WL 1056661, at *1-3 (N.D. Ill. Mar. 17, 2016) [(*Harper I*)] (plaintiff stated *Monell* claim based on Wexford's policy of "cost-cutting," including through allegations that "when [the plaintiff] received a recommended course of treatment from physicians in the gastrointestinal unit at the [UIC] Hospital, Wexford, Obaisi and Stolworthy failed to review the recommendations"); *Shaw v. Obaisi*, 2015 WL 638521, at *4 (N.D. Ill. Feb. 12, 2015) (plaintiff stated *Monell* claim against Wexford based on Wexford's alleged policies of "refusing or delaying medical treatment and/or collegial review prescribed by offsite medical professionals such as doctors at UIC"); *Watkins v. Ghosh*, 2011 WL 5981006, at *8 (N.D. Ill. Nov. 28, 2011) (plaintiff stated *Monell* claim against Wexford based on cost-cutting and understaffing policies based on allegations that "Wexford lacks a procedure for the treatment of degenerative disk disease," that "Wexford further lacks medical personnel competent to treat these conditions," and that "[r]ather than referring patients who suffer from these maladies to outside specialists, Wexford simply denies them treatment in an effort to cut costs"); *Brown v. Ghosh*, 2010 WL 3893939, at *9 (N.D. Ill. Sept. 28, 2010) (plaintiff stated *Monell* claim based on allegations that "Wexford Health pressures medical care providers to deny medical care" due to "budget constraints"); *McDonald v. Wexford Health Sources*, 2010 WL 3034529, at *3 (N.D.

17

Ill. July 30, 2010) (plaintiff stated *Monell* claim based on allegations that Wexford's cost-cutting policy resulted in, among other things, "a decreased number of medical technicians in the cell houses at Stateville, which resulted in having to wait weeks and sometimes months to receive medical care")).

This case is much closer to cases like *Harper I*, *Shaw*, *Watkins*, *Brown*, and *McDonald* than *Peacock*, *Taylor*, or *Young*. Steele alleges a specific Wexford cost-cutting policy or practice, which he claims resulted in inadequate staffing within the Stateville medical unit and a cumbersome process for outside specialist referral. *See Baker v. Wexford Health Sources, Inc.*, 2014 WL 1346613, at *5 (N.D. Ill. Apr. 4, 2014) (plaintiff satisfied *Monell* requirements based on allegations that "Wexford has a policy of denying or delaying requests for referrals to outside specialists"). And Steele's allegations directly connect the dots between this policy or practice and Steele's injury: he alleges significant delays in his referral to an outside specialist as a direct result of Wexford's cost-cutting policy related to internal staffing and outside referrals. *See, e.g.*, *Harper v. Wexford Health Sources Inc.*, 2017 WL 2672299, at *3 (N.D. Ill. June 21, 2017) (*Harper II*) (distinguishing *Peacock* and *Taylor* and finding that plaintiff stated claim by "alleg[ing] a specific [Wexford] policy: cost-cutting," and relating that policy to "his particular, detailed facts"). Moreover, unlike in *Peacock*, the link between the alleged cost-cutting policy or practice and Steele's injury is plausible because the treatments Steele needed were "expensive"—*i.e.*, referral to an outside specialist and spine surgery. *Compare Peacock*, 2016 WL 1383232, at *3 (treatment needed was bandages and antibiotics).

Steele further supports his policy or practice allegations by referencing the *Lippert* and JHA reports, as well as five examples of recent suits against Wexford alleging that Wexford's cost-cutting policy or practice prevented inmates from receiving timely medical treatment. These allegations satisfy Steele's obligation to plausibly plead "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Daniel*, 833 F.3d at 734; *see, e.g.*, *Harper I*, 2016 WL 1056661, at *3 (complaint's "reference to the experience of other inmates suggests that the injury he suffered was not an isolated incident he endured," supporting a policy or practice claim against Wexford); *Haywood v. Wexford Health Sources*, 2017 WL 3168996, at *4 (N.D. Ill. July 26, 2017) (plaintiff stated policy or practice claim against Wexford where "plaintiff ha[d] not merely alleged isolated instances of mistreatment," but instead "included specific factual allegations regarding multiple Wexford employees' repeated and consistent indifference to his and other inmates' medical needs").

Wexford points out that the *Lippert* and JHA reports evaluated conditions at Stateville prior to Steele's alleged injuries in this case, and that the *Lippert* report identifies deficiencies as being the ultimate responsibility of IDOC, not Wexford. But this is not the appropriate stage of this case for the Court to review the nuances of these reports or make factual findings regarding them. For now, it is enough that

19

they lend further plausibility to the cost-cutting policy and practice allegations in Steele's viable *Monell* claim against Wexford.[3]

## CONCLUSION

For the foregoing reasons, the Court denies both: (1) Mills and Pfister's motion to dismiss (R. 28); and (2) Wexford's motion to dismiss (R. 31).

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: May 25, 2018

---

[3] Wexford also argues that Steele's amended complaint fails to state a *respondeat superior* liability claim against Wexford. As Steele clarifies in his response, however, he had no intent to state such a claim. Indeed, the amended complaint never mentions a *respondeat superior* theory. *See* R. 21. The Court therefore declines to address this argument.